It's appeal 20-30-17. It's Robson Mortgage Limited Partners versus BGC Holding, LLC, Arlington. And Mr. Falk, oh, Mr. Falks, are you going first? Yes, I am. Okay. And let me see. You have, I see. Okay, yes. All right. You have, you go ahead. Thank you. May it please the court, Thomas Falks on behalf of the appellants, my co-counsel, Chris Langone, who's also on the FDL-Wilby family with loans for bond. I'd like to focus my brief time this morning on two issues that are fundamental to this appeal. First, whether this court possesses jurisdiction to hear this appeal. And second, whether the district court committed reversible error in its interpretation of Section 4G, which validated the appellee's breach of material obligation thereon and set about a chain of events resulting in the new property dispossession of IBGC Holdings, a valuable new property. Mr. Falks, I don't know. Judge Scudder, is Mr. Falks coming in rather choppy? It's a little bit faint. And I think we're going to, we're working in the courtroom here to turn the volume up, but it may, I don't know if there's anything you can do, Mr. Falks. It's a touch faint. Okay, let's try to speak a little bit louder. Hopefully this works. I, I think so. I, I, I think so. Okay. I will do my best to speak loudly. On the first issue, the appellants submit that the appellee's transfer from the subject property to a newly formed affiliate with common ownership, RIC Arlington LLC, is not the type of transfer that would invoke the movement statute. Notably, none of the cases cited by the appellant in its rendered the appeal moot, involved an insider or related party transfer, but rather involved arm's length sales to bonafide purchasers. That did not happen. Indeed, the appellants admit that mootness should not be invoked here because the subject property is not sold to a third party arm's length buyer for consideration, but rather appears to have been merely assigned to an affiliated special purpose entity. I just missed the last four words. Uh, rather, um, uh, that the property was assigned to an affiliated special purpose entity. Was that last word entity? Yes. It's coming in choppy. I am so sorry about this. Using the same, um, that I use that we did for our test run on, on Friday. I will speak louder and for consideration. Indeed, in its brief page 13, it states that quote, assigned its interests in the property to RIC Arlington and the special commissioner's deed found it appellee appendix a.203-04 states, likewise, with no mention whatsoever, consideration hadn't been given in light of this. Does the lack of a state pending appeal, render appellants appeal moot? Appellants contend it does not. In support of this, the appellants referenced several decisions of course, evaluating the mootness doctrine in the context of sales of property and bankruptcy, which largely invokes an interpretation section 363 of the bankruptcy code, which codifies the mootness doctrine. It provides that a reversal on appeal of a sale does not affect its validity as to an entity that purchased the property in good faith. As such, in these cases, where an appeal of a sale is mooted, it is premised upon a good faith sale of the subject property to a third party for consideration. Because time is short, I'd like to get into some of the questions that I, that I and Judge Scudder have. Um, commercially reasonable effort, uh, do not include actions that are against one's own interest. The cases you yourself, uh, yourself, um, make that point. By releasing the judicial lien, Romson would have been giving up a form of security. Why wasn't it reasonable for Romson to demand some assurance that refinancing would in fact take place and that the proceeds would be used to make the pay down? I, I don't, I really need to understand that. Absolutely, Your Honor. The simple answer to that question is that Romson effectively contracted throughout that by the last clause of section 14 of the forbearance agreement, where it was understood by the parties that the 1907-29 property and the equity therein would be the source of the $1.5 million pay down for Romson under the forbearance agreement. Essentially, uh, judges, the appellee understood that a condition to use in the 1907-29 property as collateral was the removal of its lien odds, even though that removal would predate the necessary closing of the refinancing transaction and the $1.5 million pay down. Mr. Fox, I, I have a similar question. Let me, I have, I have the, in fact, the exact same question. Let me ask it this, this way. Is it your view that immediately upon execution of the forbearance agreement that Romson's next act that very day had to have been to lift the lien? Uh, no, no judge. That, that's not necessarily the position and, and we're simply stating that Romson's obligations had to be consistent with section 14, which provided one of the two following things to him. First off, that it would promptly remove the lien upon a request of the loan parties, or even if the loan parties did not make a specific request to have the lien removed, that it would be removed by the quote unquote closing date, which I believe was May 26th of 2020. But Romson was given a set of refinancing terms, but a term sheet is a victim that can't make a loan, right? That is correct. So why couldn't the defendants provide something more than that if indeed, uh, refinancing, uh, was, was going to proceed? Why couldn't the prospective lender have told Romson, yes, we're ready for refinance. We're just waiting, uh, for you to, uh, release the judgment? Well, no lender would have been willing to commit to a refinancing while this lien remained on the 19th of September, 1995. That was a fact made clear by the lenders with whom the loan parties were speaking. And so the term sheet that was provided to Romson couldn't be, couldn't type it into a commitment unless and until the lien was removed. And I think Romson certainly understood that being a sophisticated real estate, uh, it itself would not lend on a property that had a lien hanging on it. Um, and, and similarly the lenders that the borrowers were speaking to had a similar concern. And therefore, uh, that, that section 14 before parents have been very clearly contemplates in our view that Romson understood this from the outside. They understood that this lien would have to be removed in order for the borrower to get a binding commitment by any lender to lend on the 19th of September. Mr. Fox, one of the things that concerns me as well as factual, and that is this, I and my law clerks have looked all through the record after the April 20th email, because I was convinced I was missing something. And the something that I thought I was missing was this. I thought there would have been a whole flurry of emails telling Mr. DeJonker, or I'm sorry, Mr. Factor or Mr. Bo, Hey, you can't wait any longer. The financing is imminent. You have to release the liens now. I thought there would have been all kinds of, why are you ignoring my phone calls? We were supposed to meet and you never showed up, et cetera, et cetera, et cetera. There doesn't seem to my surprise to have been any follow-up, a telephone, telephone call campaign, email campaigns, certified letters, requests for in-person meetings, et cetera, et cetera. After that April 20th exchange, am I missing something in the record? Uh, judge, I, I, I don't, I don't know that you are. I do. I do see that in the, in the record and specifically in the appendix. So why wouldn't your client have gotten on the phone and said, Hey, this is no kidding. We're not messing around here. We've got financing, but it's contingent on the lien being lifted. Of course it is. Judge, it's my understanding that there were telephone conversations that occurred after April 20th of 2020, when the original request was made. Yeah. Where are they in the record though? I don't know that they are in the record. Isn't that a problem? Well, judge, I would contend that it's not a problem because there's simply no condition in the forbearance agreement that any of this couldn't have been provided to Ron Spent understood that this was something that had to be done in order for a refinancing transaction to successfully close. Well, that's why I asked you that. That's why I asked you that question about if, should they have the very next step after signing the forbearance agreement have been to lift the liens? Well, we certainly would have appreciated it if they had done so. I, I'm not going to say that they were required to remove my day one because that's not right. And the reason I think, I think it's a wise concession. And I think the reason you're conceding that you can tell me I'm mistaken is because that would seem unreasonable to you. Because you, yeah, you think, you know, you got to have some notice that financing is getting lined up, but here, Mr. DeJoncker in the April 20th email says, Hey, I'm happy to talk about this. We just can't, we can't go naked on this property. Well, judge the entire intent of the section four G of the forbearance agreement. I hope I'm okay to finish answering your question. Of course you are. Thank you. The intent of section four G of the forbearance agreement was that, that Romsden would have to accept some risk in that it would be removing the lien before a executed refinancing transaction involving the 1907-29 property was closing such that you'd want to pay $500 million to pay Romsden. So the entry by Romsden into this agreement did require Romsden to engage in a little bit of having faith that the subsequent steps after removing the lien would be that the refinancing transaction would close. But that could have truly been against their interest. You never know what's going to happen next. You do not know what's going to happen next. But what I would state, Your Honor, is that Romsden understood that this was a necessary step to get to where we could be to effectuate a heavily negotiated forbearance agreement. And consequently, the payment of $1,500,000 to Romsden, which I would think would be in its best interest to be seen. Your Honor, we contend that, I'm sorry. Go ahead. Go ahead. We would contend, Your Honor, that in fact it was in Romsden's business interest to remove the lien and it would have been against their interest to not remove the lien because it rendered the ability of the parties to effectuate the terms of the forbearance agreement something that was very heavily negotiated impossible. Thank you very much. Ms. Smith. Good morning, Your Honors. Barbara Smith for Romsden. I think the crux of this appeal is precisely what Your Honors have been talking about, the meaning of the commercial reasonableness term in the forbearance agreement and the related question whether this appeal is moot in light of the transfer to a non-party. But I do think there are also four what I would call ancillary issues in the briefing. And I'd like to spend just a few moments at the beginning of my argument sort of clearing the brush away to address those. Before you do, with respect to mootness, what about the fact that the counterclaim seeks monetary damages and presents the same underlying issues? To that extent, the case isn't moot, is it? Well, Your Honor, I struggle to find where in the argument section of their brief either appellant made an argument with respect to their motion for leave to file counterclaims here. So I think it's a straightforward matter of appellate waiver that's been waived on appeal. And the question whether the motion for leave to file counterclaims was denied is not properly before the court because it's been waived. I think that's the most straightforward way to address the counterclaim issue. Although it's included in the issues on appeal in the S. Bobby brief, it's not developed in the argument section at all. So I think waiver applies. And even if the look behind the curtain to the merits of that motion for leave to file a counterclaim, it just wasn't an abusive discretion for the trial court to say, I'm not going to grant you leave to file a counterclaim that I have determined to be meritless. That's sort of squarely within the trial court's use of its discretion. So I think the standard of review helps us there as well. And on mootness more generally, it's true that this is not a case that's squarely on point with truly independent third party buyer situation, the cases that we cited. But because mootness is a jurisdictional Article III issue, we felt obligated to bring this to the court's attention. And I'd like to sort of discuss two things with respect to mootness. The first is an equitable consideration. And the second is the importance of clear lines in this particular area of the court's jurisprudence. The appellants in their briefs have suggested it would somehow be unfair or unequitable to find this case is moot in light of the transfer that they claim was not for adequate consideration or wasn't to a true third party. But I would argue exactly the opposite is actually true. When you have a mortgage holder like Romspen here who takes possession of a foreclosed property, it is routine to transfer that property to a special interest entity that will manage it, that will try to get some revenue from the property to make good on the debt that company is owed. And if you don't move to stay a judgment in a case like this, then all of those steps taken by RIC Arlington or taken by others in other cases could actually result in a windfall to the other side here if the court attempted to unwind the decision below. So that's the equitable point on mootness. The second is, I think, the importance of having clear lines when it comes to these types of jurisdictional and mootness questions. I think the federal rules are clear. It's easy to seek a stay. It's straightforward to seek a stay. When you have a question of real property and an issue has been decided against you, it's not difficult to simply say, hey, let's keep the property as it is right now while I, you know, attempt to appeal and exercise my appellate rights. And if you don't do that, I think the court's cases are clear. You know, you jeopardize your ability to actually get any relief. And that's true whether the property is transferred to, you know, an affiliated entity or whether it's sold to a third party buyer. It's beneficial, I think, in the context of mootness for district courts and for parties to be able to say, you know, I will follow the rules and seek a stay if I want to appeal the disposition of real property. Go ahead, Your Honor. I'm sorry, did you have a question? I didn't want to interrupt you. Yeah, but it's not on that. I mean, I find it interesting that the forbearance agreement didn't explicitly obligate the borrower and the guarantors to supply proof of the refinancing commitment. You spend an awful lot of time litigating what commercially reasonable efforts means in this context, when the agreement could have been, um, well, it could have been much more explicit about what was required before Rompson was required to release the judicial lien. Well, so, Your Honor, I think one reason perhaps there wasn't additional clarity is because we wanted there to be flexibility for the borrowers to be able to demonstrate their ability to make the paydown payment. And so if we, if the agreement had said, for example, show us a term sheet, and that's good enough, and they had come back and said, well, we don't have a term sheet, but we have this email from a lender that says they're willing to lend, then we would be litigating, you know, whether that was sufficient to be, to be a term sheet. And by keeping it, I think a little bit more general, it actually gives the borrower more, more flexibility. I also think there's an important plain reading of the contract that, uh, that cuts our way that the court really hasn't discussed yet this morning. And that's the point, that's the other side argues was this independent freestanding obligation to release the lien in any event, which is what they've argued, then section one, the first section would be totally irrelevant. There'd be no reason to have included the, the, the clause that says if, you know, if the lien, if we request you to remove the lien, you have to do it, if it were the case that the second section applied in any event. So I think the court shouldn't read the commercial reasonableness, um, language to apply only to that first section. It has to read it to apply to both sections so that both sections can be effectuated in, in the contract. So that's my sort of plain reading argument why, um, paragraph four cuts in our direction. I also think there's an important sort of broader 30,000 foot, um, you know, policy consideration, if you want to call it that, why we have the better reading of this clause. And that's just that, you know, you never read commercial contracts between sophisticated parties to lead to absurd results. And I think it would be an absurd result here to say Romspen had to sacrifice the validly issued judgment lien. It has, you know, to, to make good on the millions of dollars it's owed as a result of the defaults here on the properties, it has to release that lien, even if it knew that the parties wouldn't be able to make the payment they were required to make under the forbearance agreement. You know, you brought, you just, uh, uh, brought something to mind, uh, which is, uh, what are we to, uh, make of, uh, the arguments in, uh, uh, the reply brief that the judgment lien was invalid. I'm glad you raised that your honor, because I actually think of, of all of the, what I described at the beginning of this argument is ancillary arguments made on this appeal. That might be the biggest sort of red herring of them all. So I'd like to take a moment and walk through it a little bit. So they've, they've argued in their reply brief that the judgment lien was essentially invalid for two reasons. One, because the underlying foreclosure order was not final as a matter of Illinois law. And two, because the judgment lien included an attachment exhibit A, which is a description of the property to which the lien attached. With respect to the first argument, the sort of this isn't final as a matter of Illinois law argument. Um, that, that may be true as to the foreclosure, but it was not true as to the breach of the guarantee clause. So, uh, you know, when you think of, of joint and several liability, as you learn sort of as a first year law student, if you're jointly and severally liable for a debt and the court finds that, you know, you owe that debt, the person to whom the debt is owed can seek to attach the judgment lien to other property you hold. That's precisely what occurred here. The court found the guarantors had breached their guarantee clause and were jointly and severally liable for the $4.2 million judgment that the court had decided Romspen was owed. So there was nothing unusual or improper or inappropriate about taking that final judgment with respect to the guarantee clause and attempting to, you know, attach it via judgment lien to other properties. The second argument they make with respect to the judgment lien is that we shouldn't have included, uh, exhibit A with the Cook County recorder. Um, when we, when we presented the Cook County recorder with a assigned final, you know, order from the, from the court regarding the breach of the guarantee clause. Uh, but, but that's just, that's just really not true. Um, uh, the Cook County recorder requires parties seeking a judgment lien to include in their request, a description of the property to which the lien applies. My real estate colleagues who do this all the time, tell me this is routine. And it's also, of course, not surprising that the Cook County reporter would say you have a validly issued judgment. I see it signed by a judge to what property would you like me to attach this lien? And that's, that's what we did here. We said, here's the final signed order. And here's, you know, a legal description of the property to which we want the order to attach. I mean, you can go to the Cook County reporters public website under the FAQ section, which is of course, not designed for sophisticated lawyers like us, but designed for lay people. And it will tell you if you want to seek a judgment lien, you have to include a legal description of the property. So nothing I think inappropriate about, um, including exhibit a, as part of the judgment lien, but there's a, there's a third, I think really important consideration for the court when it comes to the judgment lien issue. Um, and that, and that's one, this isn't an issue that was discussed the finality or the propriety of the judgment lien was not decided by the trial court here. Wasn't presented to them. Wasn't decided by the trial court and isn't properly on appeal. Shouldn't be decided by the seventh circuit in the first instance, that would be true just as a matter of course, but it is particularly true in this case when there is a separate and independent state court action that I understand is still pending, um, that litigates this very issue. And the appellants have included at, um, the S Bobby appendix 34 to 44, a partial state court complaint that raises this very issue. So the question of the validity of the judgment lien, um, I think is, is not a meritorious argument for the reasons I've just explained, but would especially inappropriate for this court to address in light of that pending state court litigation. Miss Smith, would you mind addressing, um, the question I had about the factual record and in particular what the record shows after the April 20th, 2020 email correspondence, if anything. So your honor, I, you know, I'm, I'm sorry that you spent time scouring the record to look for something that isn't there, but I think as the district court properly held, there's, there's nothing after that April 20th email that, that demonstrates the debtors coming back to Romspen and saying, as you suggested, you know, we've lined up financing, it's final. All we need is for you to release the lien. And as you suggested, you would expect that type of communication. If the only thing preventing them from closing on financing were Romspen's actions by not releasing the lien. But of course, that's not the case. The only evidence they've put in the record is this term sheet, which is not a commitment to lend as anyone who's taken out a mortgage knows there are many steps after that before you actually get a loan. And I think all of that means as a legal matter that it's not Romspen's action or inaction that prevented them from closing on a deal here and therefore breaching the forbearance agreement was rather their own actions. And that's legally relevant, I think, because of the way the Illinois foreclosure law is written that says when you are the debtor and you are the reason that you breach a forbearance agreement, it's not, it's not to confirm a sale on that basis. So it wasn't Romspen's actions were inactions that led to their breach of the forbearance agreement. It was their own. And that was kind of a circuitous answer. I apologize, Judge Scudder. No, go ahead. Go ahead and finish your thought. No, no, please. The term sheet that we're talking about is the one that bears a February 4th, 2020 date. That's the next piece of correspondence? I'm not sure of the date of the term sheet. The only reason I asked that is because I would have thought for sure there's some correspondence after April 20th. There doesn't seem to be any. The next piece of... So there is... Go ahead. Go ahead. There is correspondence in the record amongst the debtors and between the debtors and the lenders, but that correspondence isn't shared with Romspen, considering that the So there's no way Romspen would have known any of the sort of subsequent communication they were having, including this email that they keep bringing up about, you know, we're not going to lend while the judgment lien is in place. Right. So the next correspondence, according to BGC, that Romspen received is the transmittal of the term sheet. And one of the questions I had about the term sheet is the term sheet seems to be two to three months out of date. That's right, Your Honor. And it would seem that Romspen would not be indifferent to the date of a term sheet in a situation where you have a borrower that's experienced a lot of financial distress. Well, I think that's actually just more evidence that it's in fact the borrower's actions or inactions that led them to be unable to make the pay down payment, not Romspen's actions. So if the term sheet had been dated more recently, that might suggest that they, did have the ability to move forward on a loan, but they didn't because of the sort of stale date of the term sheet. There are a couple of other sort of ancillary issues in this appeal that I think are relatively easy to dispense with, one of which is the allegation that the trial court erred in refusing to hold a hearing before confirming the sale. I think that that's easy to dispense with, given that Illinois courts have interpreted the foreclosure statute not to require a hearing in every case, and it's within the trial court's discretion to decide to do that or not. Not an abuse of discretion here. I also think the notice of appeal raises a question whether the trial court erred in denying an emergency motion to stay sale of the property. That's not properly before the court because that underlying order wasn't included in the notice of appeal, so the court lacks jurisdiction to hear it. I think that sort of rounds out what I would consider those other ancillary issues that the court need not and should not address in its opinion. If there are no further questions, I'd ask the court to affirm. Thank you very much, Ms. Smith. Mr. Langone, you have five minutes. Thank you, may it please the court. Um, I think the reason that there are so many questions about the facts in this case are because the trial court did not conduct an evidentiary hearing, as is required by the Illinois decision in Cortez. What would have shown at an evidentiary hearing that Judge Bucklow did not already know? Well, we would have parties would have had an opportunity to talk about the telephone calls that were talked about today. There is in the record emails after April. We attach them in the short appendix to the PK Bobby brief that a 38, a 39, a 40, a 41. These are all emails throughout the month of May. There is an affidavit from Albert John, who also in the record at a 45, a 46 and a 47 that said that they would have been ready, willing and able. There would have been the court would have been able to address the issue of the invalidity of the lien, which counsel basically acknowledged when she said that it may be true as a matter of foreclosure law that that judgment wasn't final until confirmed. And I don't think you can take, you know, as the court is obviously aware, judgment has to be final as to all parties on all claims. So they can't just separate out the guarantors and say we can go in pairing property. Judge Bucklow would have been able to hear that the 1907 property was never even subject to a lien. I mean, Romsen took, put a lien against a property that it never lent money against and had any kind of security interest against. That was part of this, this slanderous of title lien that they put out there. So there's a lot of facts that weren't developed. And, you know, PK Bobby has been very one note in his brief saying evidentiary hearing Cortez, it's required as a matter of equity. If there's a question about whether the lender's conduct prevented the debtor and the borrower from redeeming their interest, the trial court must as a matter of equity, because the foreclosure law is all about step-by-step equity. It's laid out by statute. And there's a, you know, that's why the confirmation of the sale is a very important part of the process. And when a lender like Romsen does in this case prevents the borrower from basically redeeming their interest in that property pursuant to a forbearance agreement that they paid $100,000 for in consideration of those promises. And the promise was to release the lien upon request and whether that, you know, and to release it upon request in a commercially reasonable manner, which I think gets to like Judge Stoddard's question about, did it have to be that very second? No, they had to take commercially reasonable steps to release the lien upon request. They, if that's, if releasing the lien is against their interest, they gave it up when they contracted for that in the forbearance agreement, which they received $100,000 in consideration for. So is there, is there anything that, is there anything that prevented your client from putting in front of Judge Bucklow, all of these other facts that, you know, you're positing now? In other words, the gap after that email seems very material to me. And if there were phone calls and emails and letters and requests to meet and people not showing up and not returning phone calls, et cetera, et cetera, what, what prevented your client from submitting an affidavit or declaration or asking for a hearing on the basis of that specific factual proffer? I, well, there was the, there were the facts that were laid forth in the proposed counterclaim that I think were part of that specific factual proffer. Now, a lot of this was with, with prior bankruptcy counsel. Um, but we did, those facts are different though than what I'm talking about. Those are different than what I'm talking about. Again, this would have all been, we, we were repeatedly asking for, for an evidentiary, an evidentiary hearing. So, um, and we, you know, that, that, that was not granted and that's required as a matter of law. And then a full record would have been able to, to be developed. So, you know, I, I, I think that's just, I mean, the evidentiary hearing is required. Um, the way I, I read, uh, everything was that after the fact, uh, you presented to Judge, uh, Judge Bobbo evidence that refinancing might in fact move forward, uh, but you know, before Robinson's refusal to reduce, uh, but so far as the record, the record reveals, uh, you never made this case to Robinson itself, uh, such that Robinson would have known it was obliged to release the lien. And under those circumstances, uh, Judge Bucklow found, uh, there was, uh, no need for an evidentiary hearing. You know, we, we're a court of appeals. We, we, we can only basically look at the record. Understood, which is why we had a substantive right under Cortez to have an evidentiary hearing on this, on this equitable, uh, matter. And then that that's, you know, this wasn't treated as a summary judgment motion. It was no, there were no like 56.1. There was no, the Judge Bucklow just abused her discretion and saying, I don't want to hear it and didn't hear it. And, and it should have heard it. It's really that simple under Cortez. And I see my time is up. So thank you very much. Oh, thanks to one and all, and the case will be taken under advisory. So be well, all of you.